## KINDER MORGAN OPERATING, L.P. "C" Petitioner,

v.

**Elaine CHAO, Secretary, United States Department of Labor; Federal Mine Safety and Health Administration; and Federal Mine Safety and Health Review Commission, Respondents.**

No. 02–3052.

United States Court of Appeals, Sixth Circuit.

Oct. 10, 2003.

James Park, Jr., Medrith Lee Norman, Warren J. Hoffmann, Frost, Brown & Todd, Lexington, KY, for Petitioner.

Allen H. Feldman, Nathaniel I. Spiller, Gary K. Stearman, U.S. Department of Labor, Office of the Solicitor, Washington, DC, James Callear, John T. Sullivan, Federal Mine Safety & Health Review Commission, Washington, DC, for Respondent.

Before: RYAN and BATCHELDER, Circuit Judges; and TARNOW,* District Judge.

## OPINION

PER CURIAM.

Kinder Morgan Operating, L.P. "C" ("Kinder") appeals from a final decision of

---

* The Honorable Arthur J. Tarnow, United    States District Judge for the Eastern District

the Federal Mine Safety and Health Review Commission ("Commission") affirming the Administrative Law Judge's ("ALJ") finding that Kinder Morgan's Grand Rivers Terminal marine loading facility ("the Terminal") is a "mine" as defined by 30 U.S.C. § 802(h)(1) and subject to the Federal Mine Safety and Health Act ("the Act") under 30 U.S.C. § 803. We AFFIRM the Commission's decision.

## I.

The following is taken from the parties' joint stipulation of facts. Kinder's Terminal is a marine facility located near Grand River, Kentucky. The Terminal consists of a rail-to-ground unloading and storage facility ("GRT–1"), a rail-to-barge loading facility ("GRT–2"), and a barge-to-ground unloading and ground-to-barge loading facility ("GRT–4"). Kinder receives an average of ten million tons of processed coal per year. The coal is not owned by Kinder, but by the ultimate end user, so Kinder is the bailee of the coal while it is at the Terminal.

In excess of 95% of all the coal received by the Terminal is owned by the Tennessee Valley Authority ("TVA").[1] The agreement between TVA and Kinder governs the unloading, storage, and loading of TVA's coal at the Terminal. TVA operates eleven coal fired plants, each with different specifications for the quality of coal burned at the plant. When the coal arrives at the Terminal, it has already been processed by other facilities to meet TVA's specifications; no washing, screening, crushing, or sizing of coal occurs at the Terminal.

Shipments of coal are processed through the Terminal by three methods: (1) rail-to-stockpile-to-barge, (2) barge-to-stockpile-to-barge, and (3) rail-to-barge. Under the first method, which accounts for about 75% of TVA's coal, the coal is dumped into a 100–ton hopper at GRT–1. From the hopper, the coal is fed onto two stationary belts, which transfer the coal to either (a) a conveyor belt transfer system (the "BTS") connecting GRT–1 and GRT–4, or (b) surface stockpiles. Kinder maintains up to eighteen working stockpiles for TVA's coal and places the coal in stockpiles based on TVA's directions. Coal placed in surface stockpiles is eventually moved by dozer and dump truck into hoppers for the BTS, where it is transferred to GRT–4.

Once the coal reaches GRT–4, it leaves the BTS through a chute to a 150–foot inclined belt on a radial stacker. The radial stacker segregates the coal into separate stockpiles. Since the radial stacker alone cannot create all of the required stockpiles, coal is also placed into stockpiles by dozer or dump truck. The stockpiled coal is then pushed from the stockpiles into one of four feeders that lead to a 605 foot-long underground concrete-lined draw-off tunnel. The feeders are computer controlled to facilitate precise "layer-loading" from different stockpiles, resulting in horizontal layers of coal from different sources.[2] The blended coal is then transferred onto a portable rail-mounted belt conveyor, which loads the layered coal onto barges for final shipment to TVA.

Under the second method, which accounts for 5% of TVA's coal, the coal never goes through GRT–1 or GRT–2. Instead, it

---

of Michigan, sitting by designation.

1. The remaining 5% is unloaded, stored, and loaded in an identical manner to TVA's coal.

2. For example, the first feeder could place four inches of coal on the belt, the second six, the third none, and the fourth eight, resulting in three layers totaling eighteen inches in thickness.

is unloaded from barges by crane, placed on a conveyor belt, and stockpiled. Then, the coal is "layer-loaded" and transported to TVA in an identical manner to coal under the first method.

The third method applies to approximately 20% of TVA's coal. The coal arrives in rail dump cars at GRT–2 and is unloaded first into a surge bin and then directly into barges, which transport the coal to TVA. Coal processed with the third method is not "layer loaded" or stored on the ground in stockpiles, and it is not transported to GRT–1 or GRT–4.

This matter arose from an inspection of the Terminal by the Mine Safety and Health Administration ("MSHA") on February 2, 2000. The MSHA issued three citations, which resulted in a civil penalty of $187. Kinder contested the citations, arguing that the Terminal was not subject to the Act, so the MSHA did not have jurisdiction over it to issue citations.

The dispute was submitted to an Administrative Law Judge ("ALJ"), and in a decision dated January 26, 2001, the ALJ found in favor of the MSHA and the Labor Secretary. The Commission agreed to review the decision. After oral argument, the Commission's vote resulted in a two-two split, which meant the ALJ's decision was allowed to stand. On January 1, 2002, Kinder Morgan filed an appeal, and pursuant to 30 U.S.C. § 816(a), this Court has jurisdiction over appeals from Commission decisions.

## II.

The only issue before the Court is whether the Terminal is engaged in "the work of preparing the coal" as defined by the Federal Mine Safety and Health Act ("the Act"). If the Terminal is engaged in the work of preparing coal, it is a "mine" as defined by 30 U.S.C. § 802(h)(1), subject to the Act under 30 U.S.C. § 803, and the MSHA has jurisdiction to issue citations to Kinder. If the Terminal is not so engaged, the Terminal is not a mine subject to the Act, and the MSHA does not have jurisdiction over Kinder's operation.

The relevant portion of the Act states that the Act's coverage extends to "[e]ach coal or other mine, the products of which enter ... or ... affect commerce." 30 U.S.C. § 803. Section 802(h)(1) defines "coal or other mine" to include:

> lands, ... structures, facilities, equipment, machines, tools, or other property ... used in, or to be used in[,] ... the work of preparing coal or other minerals, and includes custom coal preparation facilities.

30 U.S.C. § 802(h)(1).

In addition, section 802(i) defines "work of preparing the coal" as:

> the breaking, crushing, sizing, cleaning, washing, drying, mixing, storing, and loading of bituminous coal, lignite, or anthracite, and such other work of preparing such coal as is usually done by the operator of the coal mine.

30 U.S.C. § 802(i).

The Secretary contends that the Terminal mixes, stores and loads coal, and since all three actions are included in the definition of "work of preparing the coal," Kinder is subject to the Act. Kinder, by contrast, asserts that it does not prepare coal "as is usually done by the operator of a coal mine," so it is not a mine subject to the Act. Kinder argues that its sole function, under TVA's direction, is to handle coal already prepared to TVA's specifications, which TVA would otherwise do itself. Kinder concludes that applying the Act to it is a dramatic extension of MSHA's jurisdiction and is contrary to the Act's intent.

In the Commission's decision dated December 14, 2001, two of the Commissioners, Mary Lu Jordan and Robert H. Beat-

ty, wrote an opinion finding that Kinder is subject to the Act, while the other two Commissioners, Theodore F. Verheggen and James C. Riley, would rule Kinder is not. The split decision, which allowed the ALJ's decision in the Secretary's favor to stand, fully explored the two competing positions in this case. Because both sides were well-articulated in the Commissioners' decision, it would be duplicative for this Court to restate that detailed analysis here. Accordingly, after reviewing the record, the parties' arguments and briefs, the Commissioners' opinions, the ALJ's decision, and the relevant statutes and case law, the Court adopts the opinion of Commissioners Jordan and Beatty, affirming the ALJ and finding that Kinder is subject to the Act because it is engaged in the work of preparing coal. The Commission's decision is AFFIRMED.